200 So. 641

### WINSOR v. MASSACHUSETTS MUT. LIFE INS. CO.

3 Div. 834.

Court of Appeals of Alabama.

Feb. 25, 1941.

Wm. F. Thetford, of Montgomery, for appellant.

Rushton, Johnston & Williams, of Montgomery, for appellee.

of the body (except in case of accidental drowning or of internal injuries revealed by an autopsy), and that such death occurred within ninety days after sustaining such injury and as a direct result thereof, independently and exclusively of all other causes, the Company, subject to the conditions herein set forth, will pay one thousand dollars in addition to, and in the same manner and to the same beneficiary or beneficiaries as the other proceeds of this policy."

It was also provided by said policy that: "The benefits under this Provision shall not be payable if the death of the insured resulted directly or indirectly from self-destruction at any time, whether sane or insane, or any attempt thereat; from riot or war or any act incident thereto; from injuries sustained while performing police duty as a member of any military or naval or police organization; from aeronautic or submarine casualty; from bodily or mental infirmity, or from disease of any kind; from any poison or any gas (including carbon monoxide) voluntarily or involuntarily taken, administered, absorbed or inhaled; from infection other than that occurring simultaneously with and in consequence of bodily injury; or from injuries received while violating any law. The Company shall have the right and opportunity to examine the body and make an autopsy unless prohibited by law."

It was also provided by said policy of insurance that the company, upon receipt of satisfactory proof of death, was authorized to pay the proceeds of the policy, exclusive of any benefits therein provided, without prejudice to the claim for such benefits or to the defense thereof, and that such payment might be made without the surrender of the policy and that the company had the right to inspect said policy.

BRICKEN, Presiding Judge.

Appellant brought suit against appellee, upon the double indemnity clause of a life insurance policy issued by appellee company to Frank R. Winsor, on February 27, 1936, in which appellant, the wife of insured, is the beneficiary.

The complaint contained three counts and the amount sued for was $1,000.

The double indemnity clause of said policy, as shown by the bill of exceptions, is as follows: "Upon receipt of due proof that the death of the insured occurred during the continuance of this policy and before the anniversary of this policy on which the insured's age at nearest birthday is sixty-five years, as the result of bodily injury effected solely through external, violent, and accidental means, of which there is a visible contusion or wound on the exterior

The evidence introduced upon the trial of the case in the court below established, without dispute, that the insured died on the 2nd day of March, 1940, as the result of gas gangrene, directly resulting from the insured's being bitten by a lion on the morning of February 29, 1940, said death occurring a little less than two days after the injuries were sustained.

Said evidence further establishes, without dispute, that on the morning of February 29, 1940, about the hour of one o'clock A. M. Frank R. Winsor, a veterinarian, the insured, commonly known and called Dr. Winsor, was at a down town cafe in the

city of Montgomery, at which time and place he requested one John Crew, a taxi-cab driver, to carry him out to Oak Park; Dr. Winsor then got into the taxicab driven by Crew, and was conveyed to Oak Park, a public park and play ground in the city of Montgomery. When he reached Oak Park, Dr. Winsor directed the taxicab driver to,—"Just drive me some where out in the park," and as the driver was carrying out Dr. Winsor's instructions and while driving in the park, Dr. Winsor said, "This is all right, right here," and the taxi driver then put Dr. Winsor out at a spot testified by the driver as being "in front of the monkey cage." The driver then left, going about 200 yards to a call box where he stopped. In two or three minutes after he stopped at the call box, the driver heard Dr. Winsor make an outcry, but not as if someone was hurt. He immediately went back to where he had put Dr. Winsor out, and then he heard Dr. Winsor groan. Later, locating Dr. Winsor outside of the lion's cage, Crew testified: "I found him laying on his left side with his right arm inside the cage and the lion had his arm. It was very dark and I had to strike matches to see really what was going on. I wasn't able to make out anything at first because it was so dark. At that time the lion had his arm between his hand and elbow. His hand looked like it had been chewed. It was bloody and ragged looking. I couldn't tell how deep the wounds were on his hand but it looked like it was mangled to me."

After making repeated efforts to free Dr. Winsor from the lion, and failing to do so, Crew went for help. He found the park's night watchman, and the two of them succeeded in getting Dr. Winsor loose from the lion. After putting a tourniquet around Dr. Winsor's arm to stop the copious flow of blood, Crew, the driver, proceeded to take Winsor to Hubbard's Hospital, located nearby. Crew testified that Dr. Winsor fainted while in the taxicab after they had traveled about half the distance to the hospital, and fainted again when he left the taxicab and tried to walk.

This witness further described the physical surroundings of the lion's cage and the position of Dr. Winsor when witness reached him, and in this connection he testified: "The actual cage in which the lion was in consisted of an oblong wooden house and a semi-circular cement platform with iron bars about five or six inches apart which was attached to the lion's house. He testified that the bars were wide enough

apart, in his opinion, for the lion to get his paw out or for a man to put his hand in. He further testified that there was a fence around four and one-half feet high which enclosed the lion's cage, said fence being above five feet from the cage. That Dr. Winsor was inside of the fence surrounding the lion's cage, but on the outside of the cage itself. He testified that he did not know how the lion actually got hold of Dr. Winsor's hand."

Photographs of the physical surroundings of the lion's cage, and of the cage itself, were introduced in evidence.

These photographs show that the fence around the lion's cage was a woven wire fence, of rather large mesh, fastened to an iron pipe frame, with an iron pipe, the top of the frame, at the top of the fence extended the entire length of said fence, and with iron brakes. These photographs were introduced in evidence by the defendant. And Mr. Nelson, the night watchman at Oak Park, a witness for defendant, testified that this fence was 4½ to 5 feet high, and that there was a gate to the enclosure between the fence and the cage, and that this gate was kept locked all the time, and was locked the night Dr. Winsor was injured.

He further testified that before one could get to the lion's cage he would have to climb over the fence above described, and that signs directing people to keep out were usually on the fence around the cage, but that he could not say that there was a sign on the side of the fence where Dr. Winsor entered the night he was bitten by the lion. He further testified that the space between the fence and the lion's cage was between 5 and 6 feet, and that the distance between the iron bars on the lion's cage proper was about 4 inches.

Mr. Nelson further testified that on a previous occasion he had seen Dr. Winsor inside the above described fence close to the lion's cage, kneeling down and talking to her, and that the witness objected to Dr. Winsor being there. That he didn't know who Dr. Winsor was the first time he saw him there and did not know him until he caught him again; that the nature and disposition of this particular lion was all right. That the first time he saw Dr. Winsor at the lion's cage he told him to come out; that he didn't know who he was at that time and had to get a little rough with him; that he asked Dr. Winsor to come out, and that Dr. Winsor resisted,

and that the witness asked Dr. Winsor, "What are you doing in here at this time of the night," and that Dr. Winsor replied, "I wanted to come in there and talk to her. I love lions."

Dr. Brannon Hubbard, a duly qualified and practicing physician and surgeon, was called as a witness for the plaintiff, and testified that he attended Dr. Winsor around 1 o'clock A. M. on the morning of February 29, 1940; that Dr. Winsor told him that he had been bitten by a lion; that Dr. Winsor's right arm and shoulder were horribly lacerated from the hand to the shoulder, which mutilation he minutely described; that Dr. Winsor died as the result of gas gangrene, resulting from said injuries, and that his death occurred a little less than two days after the injuries were sustained. This witness further testified that he advised Dr. Winsor to have his arm amputated, because the bites were so very dangerous and that there was danger of bad infection, and that Dr. Winsor objected at that time to having his arm amputated, saying that, "He didn't want his arm cut off, as he had to make a living with it." Witness Hubbard further testified that he gave Dr. Winsor tetanus and gas gangrene antitoxin, and that, "In the first twenty-four hours he did all right, then his temperature—well, the poisoning started in there, and in a very short time—7 o'clock he looked very well and at 11 o'clock he was dead." As stated, this witness further testified that Dr. Winsor "died as a result of the injuries sustained of his arm."

On cross-examination Dr. Hubbard testified with reference to Dr. Winsor's condition as follows: "He didn't know but in his opinion, Dr. Winsor would not have died or would have stood a better chance if the arm had been amputated; that he did not know whether amputation would have eliminated the poisoning and pus, because he (Dr. Winsor) was hurt so; that he would have had to have penetrated right where the injury was; couldn't have cut entirely above the injury; would have had to have gotten down below the infection; that it would not have been possible to have amputated the arm entirely above the injury; that he cut all dead tissue out of the way. That he would have left the wound open if he had amputated. On re-direct examination Dr. Hubbard testified that Dr. Winsor might have died whether the arm was amputated or not; that he had lost a great deal of blood before he arrived at the hospital and that he might have died

due to shock at the time of amputation; and Dr. Hubbard stated definitely that he could not say amputation of the arm would have saved Dr. Winsor's life. Dr. Hubbard testified that at the time his idea or best judgment, was that Dr. Winsor would have had a better chance of living had his arm been amputated."

The policy of insurance sued upon was introduced in evidence.

At the conclusion of the introduction of the testimony in the case, the court gave to the jury at the request of defendant, four written charges, numbered 1, 2, 3, and 4 respectively.

Charge No. 1 is the general affirmative charge for defendant against the complaint in its entirety. Charge No. 2 is the affirmative charge against count 2 of the complaint. Charge No. 3 is the affirmative charge against count 1 of the complaint, and charge No. 4 is the affirmative charge against count 3 of the complaint.

In giving said charges, the court made an oral explanation to the jury of his reasons for so doing, and said that the court was convinced under the law the court should give the general affirmative charge in favor of the defendant, saying that:

"Considering all the undisputed evidence, the Court is of the opinion that there is not enough evidence before you to show you that this man's injury and death was directly caused by an accident. The Court takes the view, in climbing over a 4½ to 5 foot fence, it was not an accidental death, as the law defines an accident. And the Court takes the view, further, that the evidence shows an intervening cause, in the chain of circumstances, as proximately being the cause of this man's death; the Court takes the view that if he had permitted proper medical and surgical treatment he might have lived.

"To let the case go to the jury will be in the nature of permitting speculation or mere conjecture to bring about the verdict.

"So, at the request of the Defendant, I give you the affirmative charge. Let one of you sign this verdict."

The jury in response to written charges 1, 2, 3 and 4, given, as aforesaid, returned a verdict finding for the defendant, and the judgment of the court was accordingly pronounced and entered, from which this appeal was taken. There are 19 assignments of error.

The vital question presented by this appeal is the propriety of the court's action in giving said charges.

The appellant being of the opinion that under the evidence introduced upon the trial of the case a jury question was presented. Therefore the controlling question here is whether or not under the testimony set out in the bill of exceptions, and which was introduced upon the trial of this case, the injuries sustained by Dr. Winsor, resulting in his death, come within the coverage of the double indemnity clause of the insurance contract.

The casualty insured against in the double indemnity clause of the contract of insurance is death resulting from "bodily injury, effected solely through external, violent, and accidental means of which there is a visible contusion or wound on the exterior of the body, * * * occurring within 90 days after sustaining such injury, and as a direct result thereof, independently and exclusive of all other causes."

In the case of Adkins v. Metropolitan Life Ins. Co., 235 Ala. 417, 179 So. 382, 384, our Supreme Court said: "This court, in line with the great weight of authority, has recognized and applied the distinction between accidental results and results produced by accidental means, in cases where the stipulated liability is for injury resulting from bodily injuries sustained through external, violent, and accidental means."

The above pronouncement of the Supreme Court is founded upon the case of Northam v. Metropolitan Life Ins. Co., 231 Ala. 105, 163 So. 635, 636, 111 A.L.R. 622, where the court said: "While some authorities seem not to draw, or to recognize, the distinction, yet by the great weight of the adjudged cases a distinction is drawn between an accidental result and a result which is caused by accidental means; the former class holding that the result need only be accidental, while the latter class hold that, not only must the result be accidental, but the cause or means which produced or brought about the result must also be accidental."

The testimony introduced upon the trial in the court below does not show directly how Dr. Winsor got into the enclosure between the wire fence and the lion's cage. When first seen at the lion's cage on the night of the injury Dr. Winsor's arm was then gripped in the jaws of the lion, having been pulled its full length into the cage by the animal, thus drawing his body against the cage.

Dr. Winsor had been into the enclosure between the fence and the cage on two prior occasions, one of them at night, without injury to himself.

The park attendant, or night watchman, testified that the nature and disposition of this particular lion seemed to be all right, and that on a previous occasion he saw Dr. Winsor in said enclosure kneeling down close to the lion's cage, and talking to her. Dr. Winsor was not hurt on that particular occasion. So, under the testimony in this case, questions were presented for the determination of the jury among which were: Did Dr. Winsor voluntarily climb the fence and voluntarily go too near the cage, knowing it to be dangerous for him to do so? Or, did he attempt voluntarily to climb the fence and while so doing, or after having climbed over said fence, did he accidentally fall, and thus come too close to the cage? In other words, under the testimony in this case, was Dr. Winsor's position when seized by the lion voluntary or accidental? The answer is that the presumption is that of accident, as will be hereinafter explained.

In the case of O'Bar v. Southern Life & Health Ins. Co., 232 Ala. 459, 168 So. 580, 582, the Supreme Court said: "To constitute an accidental death, it must have resulted from something unforeseen, unexpected, and unusual. Carroll v. Fidelity, etc., Co., supra [C.C., 137 F. 1012], or 'which happens as by chance, or which does not take place according to the usual course of things,' or 'without foresight or expectation' or 'by reason of some violence, casualty, or vis major to the assured, without his design or consent or voluntary cooperation.' Equitable Accident Ins. Co. v. Osborn, 90 Ala. 201, 206, 9 So. 869, 870, 13 L.R.A. 267."

In Equitable Accident Ins. Co. v. Osborn, 90 Ala. 201, 9 So. 869, 870, 13 L.R.A. 267, it was said:

"The phrase, 'voluntary exposure to unnecessary danger,' involves the idea of 'intentionally doing some act which reasonable and ordinary prudence would pronounce dangerous.' As said in an analogous case, where the same phrase was construed: 'The approach to an unknown and unexpected danger does not make the act a voluntary exposure thereto. The result of the act does not necessarily deter-

mine the motive which prompted the action. The act may be voluntary, yet the exposure involuntary. The danger being unknown, the injury is accidental.' Burkhard v. [Travellers'] Ins. Co., 102 Pa. 262 [48 Am.Rep. 205].

"Death by accident has been defined to be 'death from any unexpected event which happens as by chance, or which does not take place according to the usual course of things,' ([North American] Ins. Co. v. Burroughs, 69 Pa. 43 [8 Am.Rep. 212];) and again, as 'any event which takes place without foresight or expectation of the person acted upon or affected by the event,' (May, Ins., 2d Ed., § 520.) So it is said in 1 Amer. & Eng. Enc. Law, p. 87: 'An accident, in its application to insurance policies, has been defined as an injury which happens by reason of some violence, casualty, or vis major to the assured, without his design or consent or voluntary co-operation.' "

█ It is the law that the burden of proof was upon the plaintiff to show by prima facie evidence at least that the injury was within the terms of the policy; that is to say, that Dr. Winsor died as the direct and proximate result of external, violent and accidental means. The means of the injury must have been accidental. Such is the effect of the decision of our Supreme Court in the case of Inter-Ocean Casualty Co. v. Jordan, 227 Ala. 383, 150 So. 147, 148. The same case further holds that, "When the voluntary act of the insured caused the injury, by way of, and as the result of, unanticipated and unexpected circumstance and result, it is within the terms of the contract."

In the case of Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 147 So. 127, 130, it was said: "In a suit on such a policy, plaintiff has the burden of proving that the death of insured 'resulted from bodily injury * * * solely through external violent and accidental means.' In sustaining such burden, when it is shown that death by unexplained external, violent means is established, prima facie proof is thereby made of the fact that the injuries were accidental, as the law will not presume that the injuries were intentionally inflicted by deceased." Citing a large number of cases.

█ Under the facts in this case, and above set out, can it be said that Dr. Winsor, the insured, voluntarily brought about a condition from which his death was not

to be unforeseen or unexpected, nor an unusual result of his voluntary conduct? Did he heedlessly put his life at stake regardless of the consequences which should have been anticipated? Was his act in going to the spot where he was found in the clutches of the lion, knowing the lion to be dangerous, voluntary and intentional? If so, then Dr. Winsor committed suicide. Suicide is a felony under the laws of this State, and the presumption of innocence of a crime is a matter of evidence for the consideration of the jury, and where the evidence and its legitimate inferences are in conflict, the determination of the issue is for the jury and not for the court. Protective Life Ins. Co. v. Swink, 222 Ala. 496, 132 So. 728; National Life & Accident Ins. Co. v. McGhee, 238 Ala. 471, 191 So. 884; Mutual Life Ins. Co. of New York v. Maddox, 221 Ala. 292, 128 So. 383.

If Dr. Winsor, the insured, intentionally placed himself in such position as that the caged lion would catch him, knowing that it would be dangerous for him so to do, or if he intentionally and voluntarily stuck his hand into the lion's cage, and was caught, then plaintiff would not be entitled to recover. On the other hand, if in attempting to climb the fence that surrounded the lion's cage he accidentally fell across the fence and against the cage, and was caught by the lion, or if after entering the enclosure between the fence and the cage, he accidentally fell against the cage, or accidentally came into close proximity thereto and was caught by the lion, then if his death occurred as the proximate result of the injuries received from the lion, the plaintiff was entitled to recover. We think a jury question was properly presented by the testimony introduced upon the trial of this case, and that the trial court was without authority to substitute itself for the jury, hence erred in giving the affirmative charge requested by the defendant.

We are also of the opinion that the trial court erred in charging the jury that the court was of the opinion that there was not enough evidence before the jury to show that Dr. Winsor's death was directly caused by an accident, and that in climbing over the 4½ to 5 foot fence that the death of the insured was not an accidental death, as the law defines an accident.

The bill of exceptions, signed and approved by the trial judge, contains this clause: "It is agreed that this policy (meaning the policy sued upon) was duly

executed and in full force and effect at the time of the *accident* and death of Dr. Winsor." (Emphasis ours).

■ It is the opinion and judgment of this court, also, that the trial court erred in giving the general affirmative charge in behalf of defendant upon the theory that the evidence showed an intervening cause, in the chain of circumstances, as approximately being the cause of insured's death, and that if the insured had permitted proper medical and surgical treatment, he might have lived. National Life & Accident Ins. Co. v. McGhee, supra; Standard Acc. Ins. Co. of Detroit, Mich. v. Hoehn, 215 Ala. 109, 110 So. 7.

For the errors pointed out, the judgment of the court below is hereby reversed, and this cause is remanded to said court for another trial in accordance with the views herein expressed.

Reversed and remanded.